IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

YASSIN HAYTHAME MOHAMAD, )
            Plaintiff, )
)
vs. ) Civil Action No. 09-316 E
) Magistrate Judge Maureen P. Kelly
MICHAEL C. BARONE (Superindendent), )
EDWARD J. WOJCIK (Deputy for Facility )
Management), KURT GRANLUND (Deputy )
for Centralized Services), OVERMYER (Major )
of Security), and CAPTAIN IRELAND, )
            Defendants. )

## OPINION

**KELLY, Magistrate Judge**

Plaintiff, Yassin Haythame Mohamad ("Plaintiff" or "Mohamad"), an inmate in the custody of the Pennsylvania Department of Corrections ("DOC"), filed this *pro se* civil rights action against certain supervisory personnel at the State Corrections Institute at Forest ("SCI-Forest") complaining of alleged violations of his First, Eighth and Fourteenth Amendment rights in conjunction with a planned use of force and his subsequent placement in a restraint chair for twenty-four hours. Defendants have filed a Motion for Summary Judgment (ECF No. 50). For the reasons that follow, the motion will be granted.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

This matter arises from a series of events which transpired on March 21 and 22, 2009. At the time, Plaintiff was housed in a single person cell in the Restricted Housing Unit ("RHU") at SCI-Forest. It is undisputed that as of March 21, 2009, Plaintiff was on a variety of security-

1

related movement restrictions due to his history of assaultive behavior.[1]  The restrictions, which were to be used whenever Mohamad was out of his cell, required:  that Mohamad be handcuffed at all times; that the handcuffs were to be attached to a waist belt and a tether; that he was to be shackled; that all movement was to be videotaped; that a Commissioned Officer was required to be present at all times; and that Mohamad was to wear a spit shield.[2]  (ECF Nos. 53-5, ¶¶ 2-3, 53-6, pp. 23-28)).  It is also undisputed that Defendants were aware of Mohamad's history of assaultive behavior which included an incident in 2006 when he maneuvered his cell door to appear locked and then ambushed two SCI-Fayettte Corrections Officers who entered his housing pod, stabbing both with a homemade metal shank.  (ECF Nos. 53-5, pp. 1-30, 53-6, pp. 23-28).  The SCI-Fayette incident led to his conviction for aggravated assault and attempted homicide as well as his long-term placement on a Restricted Release List by the Secretary of Corrections in 2007.  (ECF No. 53-5, 1-30, 53-6, pp. 33-35)   Additionally, by March 31, 2009, just eighteen months after arriving at SCI-Forest, Mohamad had accumulated dozens misconducts for threatening employees, and had been found guilty of a misconduct issued for assaulting an employee.  (ECF No. 53-4, pp. 17-22).

On March 21, 2009, the door to Mohamad's cell was accidently unlatched at 11:10 a.m. by a Corrections Officer stationed in the RHU Control Booth.  Video taken from a stationary camera in the ceiling of his housing pod shows Mohamad leave his cell, walk around the pod, return to his cell to don work boots, gloves, and then reach under the door of at least two cells, appearing to retrieve items from other inmates. (ECF No. 53-1, pp. 1-3). For the next fifty

---

[1] The record demonstrates that for the period 1995 through March 21, 2009, Mohamad had incurred 294 institutional misconducts, including over 100 misconducts for threatening staff members and over 35 misconducts for assaulting staff.  See ECF No. 53-4.
[2] A spit shield is designed to prevent inmates from spitting on officers and is utilized only on inmates with a history of spitting or threatening to spit on officers.  Id.

2

minutes, Mohamad is repeatedly asked by staff members stationed outside the pod to return to his cell, close the door and lay down on the floor. (ECF No. 53-1, pp. 1-3). Instead, Mohamad is seen walking around the pod, waving his hands toward the sky, making gestures to invite action, and behaving in a generally agitated state. (ECF No. 53-1, pp. 1-2).

Given Mohamad's refusal to comply with orders to return to his cell, and the possibility that another inmate had passed him a weapon, personnel at SCI-Forest made the decision to initiate a planned use of force to regain control of the inmate and to prevent him from injuring himself or others. (ECF No. 53-6, pp. 25-26). DOC staff suspicions regarding Mohamad's possession of a weapon were well-founded as a 6-inch shank, fabricated from weather-stripping material, was subsequently located in a ripped open seam of his mattress. (ECF Nos. 53-2, pp.48-50; 53-6, pp. 26).

The evidence, including a DVD of the cell extraction (ECF No. 53-1, Ex. 2), shows that as responding officers entered the cell block, Plaintiff was laying on his cell floor. After entering Plaintiff's cell, the officers attempted to place Plaintiff in handcuffs and shackles; however, Plaintiff resisted and was shocked for three to five seconds with an Electronic Body Immobilization Shield in order to obtain his compliance. Plaintiff was then handcuffed and shackled and carried out of the cell block. Other than voicing anger over the use of the shield, Plaintiff does not complain of any pain or allege assaultive behavior on the part of the officers. Id.

After being removed from the pod, Plaintiff was placed on the floor. With one officer holding each limb, Plaintiff's clothes were cut and removed so that a full body search could be completed to ensure that Plaintiff was not concealing a weapon. Plaintiff was then placed into a restraint chair, covered with a sheet, and transported outside to a nearby Psychiatric Observation

3

Cell Unit ("POC"). Plaintiff was examined by a nurse, self-reported that he sustained no injuries and was left in his restraint chair, facing a corner with a video camera. During the entire incident, Plaintiff is conversant, laughing, and reassuring the officers involved that he is "alright." (ECF No. 53-1, Ex. 2). Plaintiff candidly admits, "guards ain't stupid" and "this was the only way this was going to go down." (ECF No. 53-1, Ex. 2 [DVD 12:20-12:47]).

Plaintiff alleges that for the next 24 hours, he remained restrained in the chair, and that for 22 hours, he was left without exercise or food, and was forced to urinate and defecate on himself. (ECF No. 60). He also claims that as a result of Defendants' deliberate indifference, he developed clots in his right leg and was hospitalized. Id. The evidence, including a series of DVDs provided to the Court, belies each of these assertions. Plaintiff is observed eating a full meal and is offered the opportunity to exercise his arms. (ECF No. 53-1, Ex. 3 [DVD: 00:05-5:17]). In addition, he is repeatedly examined by a registered nurse and while some edema is noted near his feet after approximately 20 hours, his medical reports do not indicate that he was in any distress, and indicate that he was not feeling any pain or numbness. (ECF No. 53-1, pp. 8-18).

While video of the entire 24 hour period has not been provided to the Court, two exercise/feeding sessions are available. During the first session, Plaintiff refuses an opportunity to exercise but is fed. (ECF No. 53-1, Ex. 3 [DVD 00:01 – 00:10]; ECF 53-6, p. 3). During the second session, Plaintiff is seen resisting being restrained, and refuses the opportunity to stretch his right arm, insisting that only his left arm be freed for exercise. (ECF No. 53-1, Ex. 3 [DVD: 6:18]). A nurse provides Plaintiff his medication and is seen checking his pulse and return capillary function after the restraints are reapplied. Plaintiff's feet are also checked for sufficient movement and no edema is observed. (ECF No. 53-1, Ex. 3 [DVD 5:10-5:32]). Plaintiff did

urinate onto the floor while seated in the chair, but did not defecate. Notably, during one of his exercise sessions, Plaintiff repeatedly taunts one of the officers, calling him a "pussy." (ECF No. 53-1, Ex. 3 [DVD: 8:55-10:21]). He also resists being restrained after each exercise session and is otherwise belligerent. [ECF No. 53-1, Ex. 3 [DVD: 6:18]. Gordon Hefferman, one of the registered nurses in charge of Plaintiff's care, noted that "throughout the night, Inmate Mohamad was yelling and demanding to get out of the restraint chair. He was trying to rock back and forth and was threatening some of the Corrections Officers who were present." (ECF No. 53-6, pp. 20-21).

The commanding officers for the two shifts following Plaintiff's initial restraint indicate that as a result of Plaintiff's continued combative behavior, Superintendent Barone approved two extensions, for a total confinement time of 24 hours. (ECF No. 53-6, pp. 11-14, 16 -18). However, during each extension, Plaintiff was examined by a registered nurse, and was offered exercise of all limbs every two hours. (ECF No. 53-6, pp. 20-21, ECF 53-1, pp. 8-15). While he refused exercise at 1:00 a.m., Plaintiff did exercise all extremities at 11:00 p.m., 3:00 a.m., 5:00 a.m., 7:30 am and 10:10 am. (ECF No. 53-1, pp. 8-15). Plaintiff was offered and ate breakfast, and was provided with a urinal at least twice, although he did urinate on the floor at least once. (Id.)

Edema was first noted in Plaintiff's lower extremities at 7:30 a.m., although Plaintiff denied any numbness or pain. Plaintiff was removed from the chair at 12:29 p.m., and was again examined. He stated he was "O.K." but did have a "charlie horse" in his right leg. He was not in any acute distress, and continued to be monitored in the Psychiatric Observation Cell. (Id., ECF No. 60-1, pp.21-22). Video recordings of interaction with Mohamad after he was released from the restraint chair confirm no additional pain or medical complaints. (ECF No. 53-1, Ex. 2).

5

Mohamad felt sufficiently well by March 24, 2009, to stand on his bed with no clothes on, and scream extremely vulgar and sexual epithets at the examining nurse. (ECF No. 60-1, pp. 22). He was provided his routine medication and no acute distress was noted. Id. His edema was continuously monitored by medical personnel until his transfer on March 26, 2009 to SCI-Huntington, where he was instructed to keep his right leg elevated as much as possible. Id.

Other than the notation of edema, Plaintiff's medical records do not indicate any issues associated with the restraint chair. Further, Plaintiff's grievance filed in the days immediately following his transfer from SCI-Forest alleges only the improper use of the restraint chair for 24 hours and that Sergeant Bogardus "savagely pulled with all his might and anger the straps on my wrist and this was caught on hand held camera and because of this I was and still is scared (sic) on my wrists." (ECF No. 53-8, p. 33). Plaintiff makes no mention of leg pain, blood clots, thrombosis or any serious medical concern and complains only that his *hand* was injured as a result of the tightness of an arm strap. (ECF No. 53-8, pp 25- 33). Defendants confirm, however, that the straps were checked for sufficient relief and that a nurse repeatedly checked for sufficient capillary function to ensure the straps did not cause harm. (ECF No. 53-1, pp. 8-18).

Plaintiff has provided the Court with medical records indicating that he was seen at Mercy Suburban Hospital on August 3, 2011, over two years after the use of the chair restraint, for "possible acute or chronic thrombus right popliteal vein." (ECF No. 60-1, pp. 9-20). These records do not provide a link between this August 2011 medical condition and his placement over two years earlier in a restraint chair and indeed, make no mention of the incident or his health in the intervening or preceding period.

Mohamad nevertheless initiated this action on December 16, 2009, bringing claims against Defendants for use of excessive force and deliberate indifference under the Eighth

6

Amendment to the United States Constitution. (ECF No. 6). Defendants filed an Answer to the Complaint on May 5, 2010. After a lengthy discovery process, and the reassignment of Plaintiff's case to the undersigned, Defendants filed the instant Motion for Summary Judgment on November 17, 2011. (ECF No. 50). Plaintiff has filed his response in opposition, ECF Nos. 59, 60, 61 and 62, and the Motion for Summary Judgment is now ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is warranted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See Conoshenti v. Public Service Electric & Gas Company, 364 F.3d 135, 140 (3d Cir. 2004). When the moving party has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The mere existence of some evidence favoring the non-moving party, however, will not defeat the motion. There must be enough evidence with respect to a particular issue to enable a reasonable jury to find in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). See McGreevy v. Stroup, 413 F.3d 359, 363-64 (3d Cir. 2005). In evaluating the evidence at the summary judgment stage, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. Matreale v. New Jersey Dep't of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007).

## III. DISCUSSION

### A. Eighth Amendment Use of Excessive Force Claim

Under the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted . . ." U.S. Const. amend. VIII. See Ingraham v. Wright, 430 U.S. 651, 664 (1977). The cruel and unusual punishments clause "was designed to protect those convicted of crimes" and, thus, prohibits the "unnecessary and wanton infliction of pain" on prisoners in the custody of the state. An Eighth Amendment violation will therefore be found where the punishment at issue serves "no legitimate penological interest." Id. Rhodes v. Chapman, 452 U.S. 337, 345-346 (1981). See Giron v. Corrections Corp. of Am., 191 F.3d 1281, 1290 (10th Cir. 1999), quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (Where no legitimate penological purpose can be inferred from a prison employee's alleged conduct …. the conduct itself constitutes sufficient evidence that force was used "maliciously and sadistically for the very purpose of causing harm").

Courts, however, generally defer to the judgment and policies of prison officials who are charged with maintaining internal order and discipline in the prisons and often must make snap decisions in volatile and dangerous situations. Hudson v. McMillian, 503 U.S. 1, 6 (1992). Officials must balance the threats presented by prison unrest to prison workers, inmates and administrators "against the harm inmates may suffer if guards use force." Id. Because of these competing concerns, the standard to measure the propriety of the use of force by prison authorities is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000), citing Hudson, 503 U.S. at 7. To resolve the inquiry, Courts are to consider:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury

> inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009).

With respect to the first factor -- the need for the application of force -- Mohamad has admitted that he was accidentally released from his cell. ECF No. 60, p.1. While Plaintiff contends he spent the next 45 to 50 minutes quietly asking for a guard to enter the pod to personally close his cell door, ECF No. 60, p. 1, the evidence adduced, including a video recording of the entire incident, establishes the immediate danger presented by Mohamad's behavior. Plaintiff quickly left his opened cell, donned gloves and work boots, and gestured for guards to "bring it." Plaintiff then appeared to retrieve an item from a nearby cell which raised the likelihood that Plaintiff was armed with an unknown weapon. Plaintiff subsequently spent well over 45 minutes refusing to comply with a simple directive to return to his cell and close the door and instead kept asking that a guard enter the pod to close his door. (ECF No. 53-1, Ex. 1). It therefore appears clear that the application of at least some force was necessary for the officers to regain control of the situation.

As to the second factor, it also appears that Defendants used no more force than was necessary to gain control of Mohamad and maintain their safety. Indeed, Mohamad does not dispute that officers are trained to utilize certain control techniques to regain control of unruly and/or combative inmates and that one such technique is to place the inmate on the floor. (ECF No. 53-8). In addition, Defendants have asserted that they used no more force than necessary to gain control over Mohamad and defuse the situation -- assertions that are amply supported by the DVD recording. (ECF No. 53-1, Ex. 2). Mohamad has not pointed to any evidence to the contrary. The use of an EBID shield for 3-5 seconds occurred solely because

9

Plaintiff refused to bring his hands to his back at a point in time when he could have been armed. Plaintiff was not assaulted, but was grasped by several guards in an orderly manner to take physical control of his body to prevent harm. As such, consideration of the second factor -- the relationship between the need and the amount of force that was used -- suggests that no excessive force was used.

As to the third factor -- the extent of injury inflicted -- the record shows that a medical assessment of Mohamad was conducted immediately after the incident and that the resulting reports show that Mohamad did not suffer any injury and that no treatment was necessary. (ECF No. 53-1, Ex. 2; ECF No. 53-1, pp. 8-18). In fact, not only does the DVD recording corroborate that assessment but the medical report states that Mohamad denied any injury, stating "I'm okay." (ECF No. 53-1, pp. 8, 12). Thus, while not dispositive standing alone, the fact that Mohamad did not suffer a discernible injury suggests that the force utilized by Defendants was not excessive.

Nor does consideration of the fourth factor suggest that excessive force was used by Defendants as it was more than reasonable for Defendants to perceive a threat to their safety under the circumstances. Defendants have not only presented evidence of Mohamad's extensive history of assaultive behavior and threats to staff members, which Defendants were well aware of, but it is undisputed that Mohamad was being non-compliant and that the situation was getting out of control. (ECF No. 53-1, Ex. 1). Moreover, given the shank discovered in an open seam of Mohamad's mattress during the cell search that immediately followed this incident, it is quite plausible that Defendants' decision to use force to take Plaintiff into custody and then strip search him prevented serious injury to the corrections officers or other inmates.

As to the fifth and final factor, Defendants appear to have made reasonable efforts to temper the severity of force in responding to Mohamad's disturbing and disruptive behavior. The

10

record demonstrates that Defendants' repeatedly requested that Mohamad return to his cell and close the door, and that it was Mohamad's failure to comply with their instructions, coupled with the likelihood that he was in possession of a weapon, that necessitated further action by Defendants. (ECF Nos. 53-1, Ex. 1, 53-2).

This evidence clearly demonstrates that Defendants' actions in taking control of Mohamad's body, searching and then placing him in a restraint chair were designed to defuse an escalating situation that, given Mohamad's remarkable history of assaultive behavior, could have impacted the safety of Defendants as well as other officers in the area. It follows that the force used in order to place a resisting Mohamad in the chair was applied in a good-faith effort to restore and maintain discipline and, thus, designed to serve a legitimate penological interest. Moreover, Mohamad has not offered any evidence which would suggest that Defendants applied any more force than necessary or that the force used was applied maliciously and sadistically to cause harm. Indeed, review of the DVD recording of the cell extraction, which shows that the removal occurred quietly in a matter of minutes, belies any such assertion. As such, no reasonable juror could find that Defendants' use of force was excessive or in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Defendants, therefore, are entitled to summary judgment on Mohamad's Eighth Amendment excessive use of force claim.

**B. Eighth Amendment Conditions of Confinement Claim**.

Plaintiff also alleges that Defendants violated his Eighth Amendment rights by placing him in a restraint chair for twenty-four hours. The Eighth Amendment's prohibition on "cruel and unusual punishment" imposes a duty on prison officials to provide "humane conditions of confinement." Betts v. New Castle Youth Development Center, 621 F.3d 249, 256 (3d Cir.

2010), quoting, Farmer v. Brennan, 511 U.S. 825, 832 (1994). That is, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). For an alleged deprivation to rise to the level of an Eighth Amendment violation, it must "result in the denial of 'the minimal civilized measure of life's necessities.'" Id. at 835, 114 S. Ct. 1970.

To prove an Eighth Amendment violation, two requirements must be met:

The inmate must show that: 1) he suffered a risk of "serious" harm; and 2) prison officials showed "deliberate indifference" to such risk. Id., 511 U.S. at 834. The first element is satisfied when the alleged "punishment" is "objectively sufficiently serious." Id. In determining whether a prisoner has alleged a risk that is objectively serious, a court must consider not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but evidence that unwilling exposure to that risk violates contemporary standards of decency. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate. Helling v. McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 125 L. Ed.2d 22 (1993). The second criterion, deliberate indifference, requires an inmate to show that the prison official had a sufficiently culpable state of mind.

The Supreme Court clarified this deliberate indifference standard in Farmer as follows.

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation.... But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for

12

> commendation, cannot under our cases be condemned as the infliction of punishment. Farmer, 511 U.S. at 837–838 (emphasis added).

Norris v. Davis, No. 10-1118, 2011 WL 1627340 * 3 (W.D. Pa. 2011). The question of each Defendants' deliberate indifference is a subjective inquiry, while risk of harm is evaluated objectively. See Atkinson v. Taylor, 316 F.3d 257, 262 (3d Cir. 2003).

Moreover, even if his conditions were objectively harsh, Plaintiff must point to evidence upon which a reasonable jury could conclude that the prison authorities acted with "deliberate indifference" to those conditions. Burkholder v. Newton, 116 Fed. Appx. 358, 363 (3d Cir. 2004); Farmer, 511 U.S. at 833; Wilson, 501 U.S. at 297; Rhodes v. Chapman, 452 U.S. 337, 347 (1981). This requires a court to determine, subjectively, whether evidence exists that Defendants acted with a sufficiently culpable state of mind. Id. The deliberate indifference standard has been defined as requiring that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Mohamad fails to provide any evidence to support either prong of the required inquiry to support a constitutional violation. First, Plaintiff was continuously medically monitored by a registered nurse, who did not note any evidence of harm beyond mild edema in the hours just prior and subsequent to Mohamad's release from the restraint chair. (ECF No. 53-1, pp. 8-18). Second, Plaintiff's grievances, filed immediately after the incident, make no mention of any risk to Plaintiff's health and limit his only complaint to an injury to his wrist because the straps were allegedly too tight. (ECF No. 53-8, p. 33). Plaintiff's medical records and the video recordings confirm that Plaintiff's pulse and capillary function were normal throughout the period of

confinement, and were repeatedly checked to ensure that the straps did not restrict blood flow. Based on the medical records, the DVDs provided to the Court and Plaintiff's grievances, there is no evidence upon which a reasonable jury could conclude that Defendants were aware of the alleged risk of deep vein thrombosis and/or ignored the risk.

Further, the length of time Mohamad spent restrained was the direct result of his own ongoing combative behavior, coupled with his extensive history of assaults on staff members. (ECF No. 53-6, pp. 11-14, 16 -18, 21-22). The restraints were removed after two back to back medical/exercise sessions where Plaintiff remained calm and compliant. (ECF No 53-6, p. 14). At that point, he no longer appeared to present a risk to himself or others and release was appropriate. Id.

In opposition to Summary Judgment, Mohamad presents nothing more than his bare assertions to dispute Defendants' evidence that they were not deliberately indifferent to his medical needs or his safety. Based upon the clear record before the Court, Plaintiff has not met his burden to come forward with specific facts showing a genuine issue for trial and entry of summary judgment in favor of Defendants is appropriate. Fed. R.Civ.P. 56(e).

**C. Plaintiff's First and Fourteenth Amendment Claims.**

Plaintiff summarily alleges that his placement in the restraint chair occurred without due process and was retaliatory, in violation of his rights under the First and Fourteenth Amendment of the United States Constitution. (ECF No. 60, p.1, 2). He claims that his conduct was appropriate and that he did not violate any rules or regulations justifying restraint. The record, including video recordings, belies these claims as Plaintiff is seen repeatedly disobeying an order to return to his cell and close the door. He is clearly observed retrieving an item from another

14

inmate and he is observed donning gloves, work boots and gesturing guards to "bring it." His conduct alone precipitated the cell extraction and chair restraint.

To the extent that Mohamad alleges due process violations relating to excessive force, the conditions of his confinement, or the medical care received while in the restraint chair, these claims are properly addressed through the Eighth Amendment. See Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 127 L. Ed.2d 114 (1994). Further, to the extent Mohamed alleges that he was improperly restrained in retaliation for a prior lawsuit, he has offered no evidence to suggest that the Defendants had a retaliatory motive in restraining him. Based on the record presented, and Plaintiff's failure to show specific facts of impermissible retaliation or the absence of due process, Defendants are entitled to entry of summary judgment as to Plaintiff's First and Fourteenth Amendment claims.

## IV. CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment [ECF No. 50] is GRANTED. An appropriate Order follows.

AND NOW, this 30th day of April, 2012, upon consideration of Defendants' Motion for Summary Judgment [ECF No. 50], and for the reasons set forth in the Opinion entered contemporaneously with this Order after review of the record and briefs and exhibits filed in support and opposition thereto, it is HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED.

BY THE COURT:

/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

Date: April 30, 2012

cc: Yassin Haythame Mohamad
CU0143
PO Box 244
Graterford, PA 19426

All counsel of record via CM/ECF